## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA


**RYAN E. CUNNINGHAM**

     **Plaintiff**

                                      CIVIL ACTION NO. 2:11-0142

**v.**

**RONALD F. LEGRAND and**
**LEGACY DEVELOPMENT SC GROUP, LLC**

     **Defendants**

### COMPLAINT

Now into Court through undersigned counsel comes Ryan E. Cunningham, hereinafter "Plaintiff" and brings this action for a declaratory judgment pursuant to 28 U.S.C. §2201 and for fraud, extortion, and violations of the Racketeering Influence and Corrupt Organization Act (RICO) against Ronald F. LeGrand, individually,  and Legacy Development SC Group, LLC. hereinafter "Defendants" and for causes of action shows:

1.    Plaintiff Ryan E. Cunningham is a resident of Charleston, Kanawha County, West Virginia.

2.    Defendant Ronald F. LeGrand is a resident of Jacksonville, Florida whose address is: 5490 Greenland Rd., Jacksonville, FL 32258; Defendant Legacy Development SC Group, LLC is a Florida limited liability company whose address is 9799 Old St. Augustine Rd, Jacksonville, FL 32257.

### JURISDICTION and VENUE

3.    This case arises under Federal question jurisdiction, 28 U.S.C. 1331 and pursuant to

diversity of citizenship between the parties, 28 U.S.C. § 1332, because the claims set forth in this Complaint exceed the amount of $75,000.00 excluding interest and costs.

4.   Venue is proper in the Southern District of West Virginia because efforts in furtherance of the scheme or artifice to defraud set forth below occurred in Charleston, West Virginia, to-wit the delivery of a letter addressed to Ryan Cunningham at 3230 Pennsylvania Avenue, Charleston, WV 25302, which, with its exhibits, is attached hereto as Exhibit 1.

## NARRATIVE STATEMENT OF FACTS

5.   Ryan Cunningham came from a Clay County, West Virginia family that had been heavily involved in oil and gas in Clay and Roane Counties. As a boy, Mr. Cunningham worked with his grandfather in both high school and college in the oil and gas industry, which gave him insight into how the oil and gas business operates. The Mr. Cunningham had work experience with the West Virginia DEP in the Oil and Gas Division and, thereafter, worked for Oppenheimer & Co. on Wall Street in New York. Mr. Cunningham also worked for the Canadian Imperial Bank of Commerce (the parent of Oppenheimer) in New York, which broadened his experience as an institutional sales and equity trader.

6.   In 2002 Mr. Cunningham moved to Myrtle Beach, SC where he engaged in commercial real estate and land development. In 2006, Mr. Cunningham was approached by Kenneth Gwynn, an agent and partner of Defendant Ronald F. LeGrand, for the purpose of procuring a land deal in South Carolina, but Mr. Cunningham declined to participate in that deal. Mr. Gwynn also wanted to know about any other deals that Mr. Cunningham had in the pipeline, and Mr. Cunningham showed Mr. Gwynn the property owned by Buffalo Properties in Roane and Gilmer Counties of West Virginia and Boyd and Greenup Counties of Kentucky. At that time

those Buffalo properties were in bankruptcy. Mr. Gwynn represented to Mr. Cunningham that Mr. Gwynn and Mr. LeGrand had multiple funds that together controlled $1 billion in investor capital and provided Mr. Cunningham with a brochure for one fund that purported to have $200 million.

7. Mr. Gwynn was shown the materials that one of the members of Buffalo had put together and he then visited the Buffalo properties and conveyed to Mr. Cunningham that he (Mr. Gwynn) and Mr. LeGrand wanted to go forward with acquiring the Buffalo bankruptcy properties. There was a verbal agreement reached that Mr. Cunningham would have 20 percent of the company they planned to create to manage the Buffalo properties and Mr. Cunningham would have operational control of the company. The agreement also included a personal residence ( Mr. Gwynn and Rick Wheat actually visited realtors, including Margo Teeter of Old Colony, in the company of Ryan for the purpose of procuring a house.) Mr. Cunningham was also promised the use of Mr. LeGrand's King Air 90 aircraft for travel to and from Myrtle Beach because Mr. Cunningham had on-going business in Myrtle Beach. In the event, none of these promised benefits materialized!

8. Pursuant to the oral agreement, Mr. Cunningham went to John Meisner, Esq., a bankruptcy lawyer in Charleston, to formulate a plan and submit a bidding qualifications document to the Federal Court. Mr. Gwynn, Mr. Meisner and Mr. Cunningham then went to the Federal Court and bid against several interested parties for the Buffalo property and acquired the property for $7.1 million.

9. On or about 4 December 2006 Defendant LeGrand came to West Virginia to meet Mr. Cunningham and sent Mr. Cunningham a letter outlining what Mr. LeGrand wanted done and

indicating complete faith in Mr. Cunningham's abilities. However, the Operating Agreement was not signed until 30 January 2007 as the acknowledgment from the notary on Mr. Cunningham's signature indicates, which shows that most of the organization of Mountain Country Partners was done upon Mr. LeGrand's and Mr. Gwynn's oral representations.[1]

10.     At the 4 December meeting with all employees and all initial members at 405 Capital Street, Mr. LeGrand said that money was no object and the company should get oil and gas out of the ground as fast as possible. He also alluded to an upcoming equity injection or line of credit of $15 to $20 million and Mr. Cunningham structured the company in reliance on those representations.

11.     In February, 2007, after Mr. Cunningham had lived in a local hotel near the airport for close to six months, Mr. LeGrand and Mr. Gwynn still would not make good on their promises of a residence or the provision of a plane. Mr. Cunningham then learned that Mr. Gwynn had sold a percentage of his stock through Mr. LeGrand's network for $2.4 million. Mr. Cunningham demanded the same accommodation, and Mr. LeGrand reluctantly agreed but forced Mr. Cunningham to sign a note and turn over 2.5 percent of his stock. Mr. LeGrand raised $1.4 million; however, there has never been an accounting for the $375,000 above the $1.025 million Mr. Cunningham received.

12.     Notwithstanding Mr. LeGrand's misrepresentations concerning the availability of funds for operations, Mr. LeGrand initially put only $10,000 into the operating bank account and he

---

[1] The delay in the signing of the operating agreement was that Mr. Cunningham was promised a 20 percent interest in the company for his organizational efforts, but Mr. LeGrand sought to reduce his interest to 8 percent. When Mr. Cunningham wouldn't sign the agreement, his original 20 percent interest was restored.

refused to pay the bills in a timely manner.[2] Nonetheless, it was Mr. Cunningham who signed for the obligations of the company personally, including by way of example: (1) the DEP obligation covering all operations' liability such as plugging and environmental remediation; (2) lease purchase of bulldozers and backhoes;(3) purchase of four wheel, off-road Yamaha vehicles; and, (4) general trade credit.

13.   In the late Spring of 2007 Kenneth Gwynn and Rick Wheat were removed as persons to whom Mr. Cunningham was to report and Mr. Cunningham was named "President" of Mountain Country Partners at a members' meeting in Myrtle Beach, although Mr. Cunningham was not in attendance because he was working on company operations in West Virginia.

14.   In May, 2007 Mr. LeGrand called a board meeting for Jacksonville, Florida in Mr. LeGrand's office and sent a plane to pick up Mr. Cunningham and his assistant Hugh Caperton, Jr. At that meeting, Mr. LeGrand expressly voted for Mr. Cunningham to return to West Virginia and drill the first "test well" within 30 days. Due to the extraordinary movement in the oil market at that time, very few rigs were available on short notice, so Mr. Cunningham contracted with Key Energy to drill the well. Key Energy then sent a credit application to Mountain Country for signature of guarantor on behalf of the company, and the application was sent to Mr. LeGrand who refused to sign through delays but indicated that he would sign. However, because Mr. LeGrand delayed and obfuscated, Mr. Cunningham signed the guarantee because the equipment had already been moved in and site work had been begun.

_____

[2]The undercapitalization and failure to pay bills in a timely manner caused Jack Rossi, C.P.A. of Arnette & Foster to withdraw as the company's accountant and recommend Hays & Co. to take over.

15.   Over the next few weeks Mr. LeGrand's Florida office became increasingly interested in drilling progress and Mr. Cunningham asked repeatedly for the guarantee to be signed. There was a problem with the drilling and the drill bit was lodged in the hole, whereupon the drilling company and various other vendors demanded payment and Mr. Cunningham wrote personal checks on his own account for roughly $108,000. The well was finished and it was successful, but Mr. LeGrand would not pay and the entire half million dollar expense was on Mr. Cunningham's head.

16.   Thereupon, Mr. Cunningham was required to seek investors to pay for the well, so Mr. Cunningham began Raven Ridge, LLC and after much wrangling, Mr. LeGrand agreed to convey the new well to Raven Ridge. The well was NEVER paid for by Mr. LeGrand or Mountain Country!  Mr. Cunningham was thirty-one years old and in the hole for roughly half a million dollars!

17.   In the fall of 2008 Mr. Cunningham was subpoenaed by the SEC to testify concerning alleged wrong-doing on the part of Mr. LeGrand in his fund raising operations and was required to retain Michael Carey, Esq. as counsel. Mr. Cunningham and Mr. Carey went through an eight hour question session in Philadelphia involving Mr. LeGrand's money-raising for Mountain Country Partners. Mr. Cunningham was never furnished an investor list, nor did Mr. Cunningham ever raise money for the company or interact with the investors except to the extent that he was on the telephone with or in the company of Mr. LeGrand to explain operational processes. The $15,000 owed to Michael Carey, Esq. for Mr. Cunningham's representation owing to the SEC's investigation of Mr. LeGrand has never been paid by Mountain Country, notwithstanding provisions requiring it to be paid in the Operating

Agreement.

18. In 2008 Mr. Cunningham was approached by Mark Dain, Mountain Country's single largest investor, to find out what was going on with the company and what had to be done to buy Mr. LeGrand out. Mr. Dain was supposed to have been paid $3.75 million in return for his investment but he never received the money. Mr. Dain arranged for an intermediate banker who ran IEV Capital and had ties to HSBC Bank London to make Mr. LeGrand an offer of $17 million for his and all other initial members' interests in Mountain Country Partners, LLC. The bank syndicate's entity was called "Synergy Holdings Roane Oil, LLC" and Mr. LeGrand signed a contract giving temporary authority to transfer temporary title to all of Mountain Country's assets to this entity for $50,000. This initial $50,000 was paid by Mark Dain. The contract was then extended further for another $50,000 paid by Mr. Cunningham. The whole transaction was handled by Chud Dollison, Esq. of Bowls Rice McDavid Graff and Love, a Charleston law firm, and was entirely above-board except that Mr. LeGrand did not know of Mr. Cunningham's participation in the proposed buy-out.

19. Approximately four months later, when the deal was within thirty days of closing, the bottom fell out of the stock/credit/oil markets and the syndicate withdrew its willingness to fund the deal with Synergy Holdings. Thus the "temporary title" was returned to Mountain Country. At that point Mountain Country had over $600,000 in accounts payable and oil prices were falling quickly. Nonetheless, since inception, Mr. LeGrand misrepresented that he had available (or had the ability to borrow) $15 to $20 million which was promised to Mr. Cunningham on several occasions to support on-going and expansion operations.

20. In February, 2009 Mr. Cunningham voluntarily agreed to forego his salary temporarily in

order to retain qualified personnel such as Hugh Caperton, Jr. This was all decided at a member meeting at the Charleston Executive Airport in an upstairs meeting room. The company struggled for the next year with more false promises of either a loan or an equity injection. In late Spring, 2010 Hugh Caperton accepted another position from Energy Corporation of America and in a following letter to Mr. LeGrand,  Hugh Caperton recommended that Mr. Cunningham be reinstated and assume total operational control once again. It was then disclosed that a meeting had taken place sometime in June, 2010 between Mr. Caperton, Randy Burgess and Joseph Smith with Mr. LeGrand and Ms. Tish Hill present, but Mr. Cunningham was not present and has no idea what was discussed at the meeting. However, six hours later, Mr. LeGrand and Tish Hill met with Mr. Cunningham and Mr. LeGrand urged Mr. Cunningham to find new investors and prepare a sales book for new investors.

21.     Two days later, Mr. Cunningham was called by Tish Hill and told that Ron LeGrand wanted Mr. Cunningham to have no further involvement with the Company.

22.     After an arbitration in Duval County, Florida was begun pursuant to the Mountain Country Partner Operating Agreement, Mr. LeGrand and Mountain Country successfully replaced Mr. Cunningham as the responsible resident party under West Virginia oil and gas law with regard to Mountain Country's obligations; however, it is problematic whether Mr. Cunningham has been removed from personal liability for obligations such as environmental violations and capping charges that he initially undertook personally and now over which he has no control.

23.     Even today Mr. Cunningham is personally liable for the debt incurred for not paying rentals

on the bulldozer and end loader, as well as other trade credit liabilities such as the debt on the four Yamaha Rhinos.

24. At the time Mr. Cunningham borrowed on less-than-arms-length terms his $1.025 million (to satisfy obligations such as a Charleston residence previously promised by Mr. LeGrand) he had operational control of Mountain Country and could protect the value of his partnership interest. However, Mr. LeGrand has either intentionally or through willful and wanton negligence destroyed the entire value of Mr. Cunningham's interest in Mountain Country Partners, making the value of his security for the $1.025 million loan problematic.

25. The value of Mr. Cunningham's partnership interest in Mountain Country was the justification for incurring a $1.025 million liability and it was to the value of that asset that Mr. Cunningham looked to for ultimate repayment. However, Mr. LeGrand has been disposing of the capital assets of Mountain Country, to-wit the property in Kentucky, without accounting for the proceeds.

26. Thus, Mr. Cunningham filed an Arbitration Proceeding before an arbitrator in Florida for, among other things, performance of the clear and unambiguous statutory obligation under West Virginia limited liability company law to make the books available to him so that he could determine whether he is being defrauded or, alternatively, whether his investment is being dissipated through gross negligence. **And, as of this writing, the names and contact information concerning the investors have been withheld from Mr. Cunningham notwithstanding W. Va. Code** 31B-4-408 titled, "Member's right to information" which provides:

 **(a)** A limited liability company shall provide members and their agents and attorneys access to its records, if any, at the company's principal office or other reasonable locations specified in the operating agreement....

27. Ryan Cunningham is an experienced oil and gas executive and he had discovered numerous problems at Mountain Country Partners that, perhaps, could be remedied by bringing in a professional oil and gas person.

28. As indicated above, Mr. Cunningham has limited records available for his review, but according to the records provided, at the moment MCP is producing between 700 and 900 barrels of oil a month. This is based upon extrapolation from existing bank statements that show an average of about $50,000 a month in revenues. When the Kentucky property was sold, it is reasonable to infer that about 300 barrels a month were lost. However, even giving credit for 300 barrels in Kentucky, there is still a major difference between today's maximum production of 900 barrels and the 1710 barrels produced in October, 2007, the 1425 barrels produced in November, 2007, and the 2625 barrels produced in December, 2007.

29. With regard to the Kentucky property, that production was not replaced by opening new wells or repairing existing wells that had been in production during Mr. Cunningham's tenure but are not now operating. Notwithstanding that $1.275 million dollars were received from the Kentucky sale, a production increase cannot be seen from the records delivered to Mr. Cunningham for an apparent $500,000 of those proceeds that were somehow spent. From the limited financial statements given, in September, 2010 there was approximately $800,000 in the account, so where did the money go except to attempt to increase production?

30. Because Mr. Cunningham owns 17.5 percent of Mountain Country Partners, LLC, and

because it appeared to Mr. Cunningham that the company was being run into the ground, Mr. Cunningham brought an Arbitration Proceeding in Duval County, Florida for the purpose of reforming the Mountain Country Partner Operating Agreement.

## FACTS GIVING RISE TO THE FRAUD CLAIMS

31. Upon information and belief, and subject to confirmation during discovery, the individual defendant, Ronald F. LeGrand is a professional confidence man and habitual perpetrator of frauds.

32. By way of example, the assignment at issue in this Complaint, to-wit the assignment from MCP to Legacy, recites in the fifth full paragraph on page 1 of the assignment that Legacy is the holder in due course of a promissory note executed by MCP in favor of Total Realty Management, LLC.

33. Currently there is a lawsuit brought by investors against defunct Total Realty Management, LLC because Daniel Meier, principal at Fairfax's Robinson Secondary School, and his brother Thomas Meier, principal at McLean's Langley High School, worked with a former student, Mark Dain, to motivate investors to pay artificially inflated prices for land in coastal North Carolina at the height of the housing boom. Dain was a co-founder of the now defunct Total Realty Management, based out of Woodbridge, VA and which, upon information and belief, is closely associated with Defendants LeGrand and Legacy as the face of the assignment fully supports.

34. As part and parcel of Defendant LeGrand's schemes and artifices to defraud is a mastery of legal rules that make it virtually impossible for ordinary victims of his scams to bring him to account. Included by way of example of these devices is a sophisticated mastery of the law

arising from the Federal Arbitration Act, a mastery of obscure but restrictive language in LLC operating agreements, and a mastery of choice of forum and choice of law provisions.

35. At the heart of Mr. Cunningham's arbitration proceeding was a demand for equitable relief, to-wit a reformation of the operating agreement that had provided Mr. LeGrand perpetual control of the LLC notwithstanding that his ownership share is only about 35 percent.

36. As part of Mr. Cunningham's filings in the arbitration case there was an affidavit and supporting documents showing that a certain Kenneth H. Gwynn had filed for Chapter 11 bankruptcy relief while owning a 22 percent interest in Mountain Country Partners, LLC (hereinafter sometimes "MCP" or "Mountain Country").

37. Suzanne Campbell Chisholm, Esq., lawyer for Mr. Gwynn's trustee in bankruptcy, wrote to members of Mountain Country asking whether anyone would like to bid on Mr. Gwynn's 22 percent interest. Attached hereto as Exhibit 2 is the entire filing that allegedly prompted the attempt to extort from Mr. Foster, Exhibit 1.

38. Mr. LeGrand bid $5000 and Mr. Cunningham bid $6000. Several weeks after Mr. LeGrand's bid, Mr. Cunningham's bid was the only bid received.

39. Based upon the bids for Mr. Gwynn's interest, counsel for Mr. Cunningham calculated the current fair market value of the company as $27,727. The equation is: 6000 = .22X

$$X = 27,272$$

40. MPC had paid $7.1 million for the Buffalo properties and Mr. LeGrand raised another $2.4 million; thus, at its inception MCP was, at least arguably, a $9.5 million company. Now by Respondent LeGrand's own admission, MCP, has been reduced to having a fair market value of $22,727 if we take Mr. Cunningham's willingness to pay $6,000. as the fair market

value of 22 percent.  Now if management has miraculously turned $9.5 million into $27,272 and if this $9,472,728 loss is attributable to: (1) misrepresentation concerning capitalization; (2) misappropriation; (3) complete incompetence; and (4) willful indifference, then Mr. Cunningham is entitled in arbitration at least to the equitable relief of having the Operating Agreement reformed to allow membership control of the company.

### The RICO Predicate Acts

41.   Defendant Legacy Development SC Group, LLC  is an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce and carrying on activities that affect interstate commerce, to-wit, the purchase and sale of real property from a headquarters in Jacksonville, Florida.

42.   Defendant Ronald F. LeGrand is an individual who directs Legacy Development SC Group and also directs Mountain Country Partners, LLC, which is also an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce and carrying on activities that affect interstate commerce, to-wit, the production of oil and gas in the State of West Virginia for distribution throughout the United States.

43.   Total Realty Management, LLC is, upon information and belief, a defunct Virginia LLC that engaged in massive fraud in the sale of real estate in North and South Carolina and was an "enterprise" as that term is defined in 18 U.S.C. § 1961, and which enterprise was inextricably intertwined with Defendant Legacy, Defendant LeGrand as more fully appears from the first page of the alleged assignment of Plaintiff's note, Exhibit 1.

44.   Defendants, for the purpose of executing the scheme or artifice to defraud the Plaintiff Cunningham of his rights as a shareholder of Mountain Country Partners, LLC, upon

information and belief and subject to confirmation during discovery, did enter into a sham transaction by which Plaintiff Cunningham's note was assigned by Mountain Country Partners to Legacy Development SC Group, LLC <u>for</u> <u>less</u> <u>than</u> <u>adequate</u> <u>consideration</u> and as part of Total Realty Management's massive fraud in Northern Virginia.

45.   Upon information and belief, Legacy Development SC Group, LLC is entirely under the control of Ronald F. LeGrand as Exhibit 1 will clearly show by virtue of the fact that the assignor entity MCP signed through Mr. LeGrand and the assignee entity, Legacy, signed through Mr. LeGrand.

46.   In order to prevent Plaintiff Cunningham from bringing to completion the arbitration in Florida that sought to reform the Operating Agreement of Mountain Country Partners, LLC, and to extort money from the Plaintiff to which they are not entitled, both Defendants used the mails of the United States, to-wit the letter mailed on 2 March 2011 from Thomas J. Fraser, Jr. Esq. representing Defendant Legacy to Ryan Cunningham, Exhibit 1 and/or interstate wire communications for the purposes of effectuating the scheme to extort money from the Plaintiffs through the threat of legal actions in violation of 18 U.S.C. §§ 1341, 1343 and 1346.

47.   Such use of the mails and/or interstate wire communications for the purposes of effectuating the scheme to extort and/ or defraud included, without limitation, the following:

(A) The mailing of a letter from Defendant Legacy's lawyer implying that expensive litigation would be commenced in Duval County, Florida as retaliation for Plaintiff having availed himself of the arbitration remedy provided in the MCP Operating Agreement;

(B) The use of the telephone wire by by Defendant LeGrand or his agents and servants to Mr. Fraser and/or his agents and servants for the purpose of putting into effect the plan to extort in furtherance of Mr. LeGrand's overall scheme or artifice to defraud;.

48. Defendants, for the purposes of executing the scheme to defraud Plaintiff and others of their property, transmitted and caused to be transmitted communications by means of a wire and the mails between themselves in interstate commerce. Such interstate communications by wire included, without limitation, telephone calls amongst agents, servants and employees of the two Defendants..

49. The Defendants have invested in, maintained an interest in, and participated in the affairs of an enterprise or enterprises, namely Legacy Development SC Group, LLC, Total Realty Management, LLC and MCP through a pattern of racketeering activity. The defendants have conspired with one another and among officers and their respective enterprises to enrich themselves at the expense of the Plaintiff and other similarly situated investors in West Virginia and throughout the United States.

### The "Scheme or Artifice to Defraud"

50. Defendant Ronald F. LeGrand is a professional deal maker. Upon information and belief, Mr. LeGrand acquires victims through an elaborate business of giving seminars on real estate throughout the United States.

51. Based upon Mr. LeGrand's image as a real estate expert, Mr. LeGrand raises money from his former students and others.

52. Upon information and belief, and subject to confirmation during discovery, Mr. LeGrand

regularly enters into transactions from which he takes substantial money "off the top" through payments to himself either from borrowed funds or from investor funds and then allows the enterprise to go bankrupt or so manages the enterprise that the investors receive little or nothing.

53.    Upon information and belief, Mr. LeGrand regularly, though the mails and wires, makes complicated and misleading representations to unsophisticated investors and to such persons as he wishes to recruit for appearances sake, such as Mr. Cunningham, to serve as nominal employees.

54.    A concrete example of this scheme or artifice to defraud is his handling of Mountain Country Partners, LLC, an enterprise in which was initially invested $9.5 million and which is today worth arguably no more than $2,727. (See Exhibit 2.)

55.    Upon information and belief and subject to confirmation during discovery, Mr. LeGrand has been and is currently under investigation by the SEC for fraudulent fund raising and illegal investment practices.

56.    Upon information and belief and subject to confirmation during discovery, Mountain Country Partners, LLC and Legacy Development SC Group, LLC have common management.

57.    The assignment of Plaintiff Cunningham's note by MCP to Legacy was not an arms length, good faith transaction, and had the effect of reducing Plaintiff Cunningham's interest in his own note by 17.5 percent because Mr. Cunningham had a 17.5 percent interest in the creditor, MCP.

58.    The note that Plaintiff Cunningham executed in favor of Mountain Country Partners, LLC

was induced by fraud and coercion as set forth in the narrative section above.

59.     The letter from Thomas Fraser, Jr., Exhibit 1, was a deliberate attempt to obstruct justice and prevent a full and fair resolution of Mr. Cunningham's claims under the Operating Agreement of Mountain Country Partners, LLC in a duly constituted arbitration in Duval Country, Florida.

## JURY TRIAL DEMAND

With regard to all issues raised in this complaint that are triable as a matter of right before a jury, Plaintiff demands a trial by jury.

## PRAYER

**WHEREFORE,** Plaintiff prays, pursuant to the Federal declaratory judgement statute, that this Honorable Court declare that: (1) there is no default currently on Plaintiff's note; (2) the assignment from Mountain Country Partners to Legacy Development SC Group was a fraudulent transfer not for good and valuable consideration and must be rescinded; and, (3) both Defendants have conspired to perpetrate a scheme or artifice to defraud. Pursuant to the RICO counts, Plaintiff prays for damages against both Defendants in the amount of $1.2 million and for punitive damages in such amount as the jury shall determine is necessary to punish the Defendants and to dissuade others similarly situated from similar conduct in the future, or in the alternative, Plaintiff prays that the court award a further sum pursuant to 18 U.S.C. 1964(c) to provide the Plaintiff treble damages; that the Court award all attorney fees, suit expenses and the costs of this proceeding; and, that the Court award such other and further relief, both legal and equitable, as justice and the nature of the cause may require.

Respectfully submitted,

Ryan E. Cunningham,
by counsel

Richard Neely W. Va. Bar # 2709
Michael O. Callaghan W. Va. Bar #5509
**NEELY & CALLAGHAN**
159 Summers Street
Charleston, WV 25301-2134
Phone: (304) 343-6500
Fax:   (304) 343-6528