UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RYAN E. CUNNINGHAM,

Plaintiff,

v. Civil Action No. 2:11-cv-0142

RONALD F. LEGRAND and
LEGACY DEVELOPMENT SC
GROUP, LLC,

Defendants.

MEMORANDUM OPINION AND ORDER

Pending are the parties' cross motions for summary judgment, with plaintiff and defendants having filed on February 13, 2012, and February 17, 2012, respectively.

## I. Background

Plaintiff Ryan E. Cunningham is a West Virginia resident primarily in the business of procuring commercial real estate. (First Am. Compl. ¶¶ 1, 5). At issue in this action are his business dealings with defendant Ronald F. LeGrand, a citizen of Florida, and Legacy Development SC Group, LLC ("Legacy"), a Florida limited liability company that LeGrand manages and directs. (Id. ¶¶ 2, 23).

In 2006, plaintiff was approached by Kenneth Gwynn, then a commercial project manager for LeGrand. (Gwynn dep. at 6-7; Cunningham dep. at 69-70). Gwynn inquired whether plaintiff was interested in purchasing land in South Carolina. (Id.). Plaintiff declined to participate in any South Carolina land deal, but instead identified property in West Virginia and Kentucky that Gwynn and LeGrand might consider purchasing. (Id.). In particular, plaintiff, who has significant experience in the oil and natural gas industries, alerted Gwynn to certain oil and gas-producing property located in Roane and Gilmer Counties in West Virginia and in Boyd and Greenup Counties in Kentucky, owned by an entity referred to as Buffalo Properties (the "Buffalo property"). (Id.; LeGrand dep. at 24-25). Plaintiff informed Gwynn that the Buffalo property was involved in a bankruptcy proceeding and was to be sold at public auction. (Cunningham dep. at 69-70; Gwynn dep. at 10). Gwynn represented to plaintiff during this initial conversation that he and LeGrand had access to as much as $1 billion in investor capital to purchase and manage the Buffalo property. (Cunningham dep. at 69-70).

Gwynn thereafter informed plaintiff that he and LeGrand wanted to acquire it. (Id.). According to Cunningham, he and Gwynn reached a verbal agreement whereby the three of

them -- plaintiff, Gwynn, and LeGrand -- would create a company to acquire and manage the Buffalo property and any oil and gas extracted therefrom. (Id.). Pursuant to the verbal agreement, plaintiff was to have a 20% equity interest in and operational control of the proposed management company. (Id. at 72).

In October 2006, plaintiff, Gwynn, and LeGrand created Mountain Country Partners LLC ("Mountain Country"), a West Virginia limited liability company, to manage the Buffalo property. Consistent with the verbal agreement, Mountain Country's operating agreement provided plaintiff a 20% equity interest in the company. (Cunningham dep. at 18-19). LeGrand and Gwynn were also named minority owners.[1] LeGrand exercised substantial control over Mountain Country, however, inasmuch as the operating agreement provided him a majority voting interest and designated him as the company's manager. (Id. at 82; Gwynn dep. at 15). At some point in late 2006, Mountain Country acquired the Buffalo property at public auction for $7.1

[1] At the pretrial conference held by the court with counsel for the parties on May 4, 2012, one or both counsel indicated that the stock ownership in Mountain Country at the outset was Cunningham 20%, Gwynn 20%, LeGrand 34%, and Ron Wheat, a business associate of LeGrand, 20%. Cunningham paid a nominal cash consideration of $1 for his interest; the others may have paid something close to the same. The remaining 6% interest in Mountain Country was held at some point by a number of other investors.

**million. (Arbitration Response at 2, attached as Ex. 2 to First Am. Compl.).**

**The crux of this action concerns the subsequent execution by plaintiff of a promissory note payable to Mountain Country in the amount of $1,025,000 that was later assigned by Mountain Country to the defendant Legacy, another company managed and directed by LeGrand. Plaintiff's transaction followed a pattern similar to an earlier one involving Gwynn, who, in late 2006, attempted to sell some of his stock in Mountain Country in order to raise funds to purchase a home. (Gwynn dep. at 14-15). LeGrand agreed that Mountain Country would repurchase a portion of Gwynn's stock -- 3% of the company -- for $2.4 million, but represented that Gwynn would have to execute a promissory note in favor of Mountain Country before his stock in the company could be transferred. (Id. at 18-19). A promissory note was required, according to LeGrand, due to a rule of the U.S. Securities and Exchange Commission prohibiting the outright sale of stock in an entity during the entity's first year of existence. (LeGrand dep. at 47-48; Gwynn dep. at 17-18, 23-24). Thus, the sale would look like a loan of the $2.4 million Gwynn received. LeGrand allegedly assured Gwynn that the note was a mere formality and would be forgiven before it matured. (Id. at 17-19).**

**Accordingly, on January 1, 2007, Gwynn executed a promissory note in favor of Mountain Country for $2.4 million. In return, Gwynn gave up a three percent stake in the company and received $2.4 million. (Gwynn dep. at 15-19). Presumably, the $2.4 million was derived from the acquisition of funds in $800,000 increments, or a divisible portion thereof, by way of loans to Mountain Country by investors who could convert their loans to a stock interest in Mountain Country that would cost the equivalent of $800,000 per 1% of interest. (See Complaint, S.E.C. v. Ronald F. LeGrand and Frederick E. Wheat, Jr., No. 2:11-cv-0474 (S.D. W. Va. July 12, 2011)).**

**In February 2007, plaintiff came to believe that Mountain Country by LeGrand had purchased a percentage of Gwynn's stock in Mountain Country for $2.4 million and demanded the same accommodation. (Gwynn dep. at 22-23; Cunningham dep. at 18-20). Through LeGrand, Mountain Country agreed to purchase a portion of plaintiff's stock, representing a 2.5% interest in Mountain Country, but required that plaintiff also execute a promissory note in favor of Mountain Country. (Id.). Plaintiff claims that LeGrand made the same representations to him as he made to Gwynn, namely, that execution of a promissory note was merely a formality and that the note ultimately would be forgiven. (Id.). On March 26, 2007, plaintiff executed a**

promissory note for $1.025 million payable to Mountain Country -- a transaction used to avoid an outright stock sale -- and "gave up" a 2.5% stake in Mountain Country. (Note at 1; Cunningham dep. at 12, 18-20). The note was secured by plaintiff's remaining 17.5% interest in Mountain Country and any distributions he would receive as an owner of Mountain Country. (Note at 1; Pledge and Security Agreement ("Security Agreement") at 1). Plaintiff received $1.025 million as part of the transaction.

Plaintiff next claims that, in July 2008, LeGrand fraudulently transferred the promissory notes executed by plaintiff and Gwynn.[2] Specifically, plaintiff contends that Mountain Country owed roughly $3.4 million to an investor named Mark Dain. (Cunningham dep. at 41-43). When Dain threatened to sue Mountain Country for the money owed, LeGrand caused the debt to be satisfied with funds from defendant Legacy, the company that he manages and directs. (Id. at 42-43). LeGrand, acting on behalf of Mountain Country, then assigned the notes executed by plaintiff and Gwynn, which totaled $3.425 million, from Mountain Country to Legacy. (Assignment of Promissory Note and Security Interest at 1).

[2] Plaintiff has since withdrawn the fraudulent transfer claim. See infra Part II.C.3.

In July 2010, plaintiff instituted an action for injunctive relief in the Circuit Court of Kanawha County, West Virginia, naming as defendants LeGrand and Mountain Country. (First Am. Compl. ¶ 15; see also Complaint for Injunctive Relief at 1, attached as Ex. 1 to Defs.' Mot. to Dismiss). Plaintiff sought an order enjoining "the alienation and disposition of property and assets held by Mountain Country . . . due to an ongoing fraud being committed by [LeGrand]." (Complaint for Injunctive Relief at 7, attached as Ex. 1 to Defs.' Mot. to Dismiss). Plaintiff also sought an order "directing defendants Mountain Country . . . and Ronald LeGrand to provide plaintiff . . . access to all corporate records including all investor contact information, the corporate office, and that he be given operating control of Mountain Country." (Id.).

LeGrand and Mountain Country moved to dismiss or stay the state court action on the grounds that, among other things, the Mountain Country operating agreement contained a mandatory arbitration clause. LeGrand and Mountain Country raised their own counterclaims against plaintiff, alleging that he had violated various duties owed to Mountain Country. (Mem. Supp. Defs.' Mot. to Dismiss at 3).

Prior to the state court hearing on defendants' motion to dismiss, plaintiff initiated an arbitration proceeding

against LeGrand and Mountain Country in Jacksonville, Florida. (First Am. Compl. ¶ 15; Def.'s Mem. Mot. Dismiss at 1-2). Among other things, plaintiff alleged that LeGrand had "disposed of real property . . . belonging to Mountain Country without accounting for the proceeds to the members"; had excluded plaintiff from exercising any control over Mountain Country; and was "running Mountain Country . . . into the ground because the company is under-capitalized, fails to pay its obligations as they become due, and has virtually no on-the-ground competent management." (Letter concerning arbitration proceeding, attached as Ex. C to Defs.' Mot. to Dismiss). As a result, plaintiff sought in arbitration an order declaring, inter alia, "that some or all of the note [executed by him and] payable to [Mountain Country] . . . be declared void for fraud, duress and misrepresentation." (Arbitration Statement at 15, attached as Ex. D to Defs.' Mot. to Dismiss).

By order entered November 5, 2010, the Circuit Court of Kanawha County granted plaintiff's record request in the state court action. (Order at 2, attached as Ex. B to Defs.' Mot. to Dismiss). In light of the pending arbitration proceeding, however, the Circuit Court further ordered that the state action be stayed pending arbitration. (Id.).

**On March 2, 2011, plaintiff received a letter from Thomas J. Fraser, Jr., counsel for Legacy (the "Fraser letter"). (First Am. Compl. ¶ 28). In pertinent part, the Fraser letter alerted plaintiff that Legacy (which, due to the assignment by LeGrand, was the holder of plaintiff's promissory note to Mountain Country) had "reason to believe that [plaintiff had] become financially unstable" and had "filed in the public records of the State of West Virginia statements in derogation of the value of the Collateral" securing his promissory note (i.e., plaintiff's equity interest in Mountain Country). (Fraser Letter, attached as Ex. 1 to First Am. Compl.). The Fraser letter demanded that plaintiff "provide an additional $400,000 in acceptable collateral or reduce the outstanding obligation by paying $400,000 to Legacy." (Id.). In the event plaintiff failed to comply with this demand, Legacy threatened to "take such action in regard to [his] Default as it deems appropriate." (Id.).**

**On March 4, 2011, two days after receiving the Fraser letter, plaintiff instituted this action against defendants LeGrand and Legacy. On May 11, 2011, plaintiff filed his first amended complaint, which the court understood to raise two claims: an obstruction of justice claim, and a claim for declaratory judgment. (First Am. Compl. ¶¶ 26-29). By**

memorandum opinion and order entered August 9, 2011, the court dismissed plaintiff's claim for obstruction of justice. See Cunningham v. LeGrand, No. 2:11-cv-0142, 2011 WL 3475546 (S.D. W. Va. Aug. 9, 2011). With respect to his remaining declaratory judgment claim, plaintiff seeks an order declaring the following:

> (1) that the note plaintiff executed in favor of Mountain Country is not currently in default;
>
> (2) that the assignment of such note from Mountain Country to Legacy was a fraudulent transfer;
>
> (3) that Legacy was not a bona fide purchaser of the note;
>
> (4) that the note was induced by fraud and is thus void; and
>
> (5) that Legacy knew the note was void when it received the note from Mountain Country.

(First Am. Compl. at 8 (WHEREFORE clause)).

On August 29, 2011, plaintiff moved for sanctions on the grounds that defendant Legacy filed a lawsuit in Florida state court involving the same causes of action set forth in the counterclaim in this suit. The court denied plaintiff's motion by memorandum opinion and order. See Cunningham v. LeGrand, No. 2:11-cv-00142, 2011 WL 4716227 (S.D. W. Va. Oct. 6, 2011). Both plaintiff and defendants have since moved for summary judgment.

## II. Motions for Summary Judgment

### A. Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record

as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

**B. Choice of Law**

**Defendants contend that to the extent plaintiff's request for declarations involve allegations of fraud, West Virginia law should apply. For the remaining declarations, defendants assert that Florida law governs pursuant to the choice of law clauses contained in the note and security agreement. Plaintiff references neither Florida nor West Virginia law in setting forth the fraud allegations in the first amended complaint, nor does he discuss in his briefing which law he considers applicable.**

**When exercising diversity jurisdiction, a federal district court must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Volvo Const. Eqpt. N. Am., Inc. v. CLM Eqpt. Co., Inc., 386 F.3d 581, 599-600 (4th Cir. 2004). Thus, the conflicts rules of West Virginia apply. "In general, [West Virginia] adheres to the conflicts of law doctrine of lex loci delicti." Syl. pt. 1, Paul v. Nat'l Life, 352 S.E.2d 500 (W. Va. 1986). "[T]hat is, the substantive rights between the parties are determined by the law of the place of injury." Vest v. St. Albans Psychiatric Hosp., 387 S.E.2d 282, 283 (W. Va. 1989) (citation omitted).**

Plaintiff's request for declarations regarding fraud in the inducement sounds in tort. See Traders Bank v. Dils, 704 S.E.2d 691, 697 (W. Va. 2012). The record indicates that Cunningham was living in a West Virginia hotel at the time he signed the note and security agreement, though it is unclear whether he was in West Virginia when the allegedly fraudulent statements were made. (Cunningham dep. at 38). Inasmuch as plaintiff does not contest defendants' assertion that West Virginia law governs this claim and inasmuch further as the facts as currently set forth do not indicate otherwise, the court will apply West Virginia law to plaintiff's request for declarations regarding fraud.

The note and security agreement contain choice of law clauses. (See Note at 1 ("This Note is to be construed and enforced according to the laws of the State of Florida."); Security Agreement at ¶ 14 ("This Agreement will be construed in accordance with the applicable laws of the State of Florida.").

Generally, West Virginia will recognize the parties' choice of law provision "unless the chosen state has no substantial relationship to the parties to the transaction or unless the application of the law would be contrary to the fundamental public policy of the state whose law would apply in the absence of a choice of law provision." Bryan v. Mass. Mut.

Life Ins. Co., 364 S.E.2d 786, 790 (W. Va. 1987). See also Gen. Elec. Co. v. Keyser, 275 S.E.2d 289, 293 (W. Va. 1981); cf. Lee v. Saliga, 373 S.E.2d 345, 351 (W. Va. 1988) ("Our traditional contract conflict rule gives substantial deference to the state where the contract is made and where it is to be performed, assuming both incidents occur in the same state. This rule is subject to two qualifications: (1) that the parties have not made a choice of applicable law in the contract itself; and (2) the law of the other state does not offend our public policy.").

Both instruments bear a relationship to Florida inasmuch as LeGrand (who executed the security agreement on behalf of Mountain Country) is a citizen of Florida. In addition, Legacy (the current holder of the note and security agreement) is a Florida limited liability company. Because the court is not aware of any fundamental public policy that would be offended by the application of Florida law, and because plaintiff does not object to application of Florida law, the choice of law provisions are deemed valid. Thus, the note and security agreement, as well as defendants' counterclaim for breach of contract, are governed by Florida law.

C. Plaintiff's Request for Declaratory Relief

As noted, plaintiff seeks a judicial declaration that 1) the note was the product of fraud in the inducement "and is thus void"; 2) the note is not in default; 3) the assignment of the note from Mountain Country to Legacy was a fraudulent transfer; 4) Legacy is not a holder in due course of the note; and, (5) Legacy knew the note was void when it received the note from Mountain Country. (First Am. Compl. at 8 (WHEREFORE clause)).

1. That the Note was a Product of Fraud in the Inducement

Fraud in the inducement may provide a defense to a breach of contract claim. See Traders Bank v. Dils, 704 S.E. 2d 691, 697-98 (W. Va. 2010). In West Virginia, the essential elements of fraud are as follows: (1) the act claimed to be fraudulent was the act of the defendant or induced by him; (2) it was material and false; (3) plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) plaintiff was damaged because he relied upon it. Syl. pt. 12, Poling v. Pre-Paid Legal Servs., Inc., 575 S.E.2d 199, 202 (W. Va. 2002) (quoting syl. pt. 1, Lengyel v. Lint, 280 S.E.2d 66 (W. Va. 1981)). "Allegations of fraud, when denied by proper pleading, must be established by clear and convincing proof."

Syl. pt. 5, Tri-State Asphalt Prod., Inc. v. McDonough Co., 391 S.E.2d 907, 909 (W. Va. 1990) (quoting syl. pt. 5, Calhoun Cnty. Bank v. Ellison, 54 S.E.2d 182 (W. Va. 1949)). It has been observed that under West Virginia law, the burden of proving fraud is "unquestionably heavy." See Elk Ref. Co. v. Daniel, 199 F.2d 479, 482 (4th Cir. 1952); Steele v. Steele, 295 F. Supp. 1266, 1269 (D.C. W. Va. 1969) (stating that "a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence" (citing Hunt v. Hunt, 114 S.E. 283 (W. Va. 1922))).

The gravamen of plaintiff's fraudulent inducement claim is that LeGrand fraudulently induced him to execute the promissory note to Mountain Country by misrepresenting the effect of the note. Specifically, plaintiff contends that LeGrand misrepresented (1) that certain securities rules precluded plaintiff from selling his shares outright during Mountain Country's first year of existence; (2) that plaintiff could nevertheless sell and transfer his shares to Mountain Country by first executing a note in favor of Mountain Country; and (3) that the note would be forgiven before its maturity date. (Cunningham dep. at 18-20).

Defendants contend that even if disputed facts are resolved in his favor, plaintiff is not entitled to a declaration that the note or the security agreement is void inasmuch as West Virginia law holds that a contract fraudulently induced is at most voidable.

Well over a century ago, the Supreme Court of Appeals of West Virginia held that "[a]ny contract, the making of which is induced by fraud of either party practiced upon the other at the time the contract is made, or while negotiations in regard to it are being carried on, is voidable, and may be rescinded at the election of the party defrauded." Engeman v. Taylor, 33 S.E. 922 (W. Va. 1899). Indeed, "[a] contract fraudulently procured is not void, but only voidable, and the party complaining may elect to repudiate it or to be bound by it." Syl. pt., Coffman v. Viquesney, 84 S.E. 1069 (W. Va. 1915).[3] In accordance with the foregoing authority, a promissory note fraudulently induced is at most voidable.[4]

[3] See also syl. pt. 1, Jones v. Comer, 13 S.E. 578 (W. Va. 1941) ("Fraud in the procurement of deed or contract always renders deed or contract voidable.").

[4] In this connection, the innocent obligor must either repudiate the contract or choose to waive the defect and ratify it. See, e.g., Osborne v. Holt, 114 S.E. 801 (W. Va. 1922) (fraudulently induced stock purchaser must either ratify the

(Contin.).

As to the factual question of fraudulent inducement, defendants concede that Cunningham and Gwynn have testified that LeGrand, through his alleged agents, told both men that the note and security agreement were mere formalities and did not represent valid obligations. (Cunningham dep. at 17-18, 20-21; Gwynn dep. at 23). Defendant LeGrand denies making such assurances and directs the court to the documents involved in the transaction, including a letter from LeGrand's agent, Rick Wheat, to Cunningham that describes the transaction as a real obligation that the parties expected to be performed. (Letter

---

contract of subscription and sue for resulting damage or he may repudiate the contract, return the stock received and maintain a suit to recover money paid by him therefor); see also Restatement (Second) of Contracts § 7.

It is a fundamental principle of equitable rescission that parties must be restored to their pre-contractual position. See Syl. pt. 3, in part, Spangler v. Johnson, 127 S.E. 398 (W. Va. 1925) ("Upon rescission of such contract the parties must be placed in status quo as near as may be, consistent with equity."). Although the tender or return of consideration usually must be made prior to rescission, the rule is not inflexible. See id. ("If inability of the injured party to make complete and full restitution is due to no fault on his part, and substantial justice can be done without it by the decree, rescission will be allowed."); see also Engeman, 33 S.E. 922 at 939-940 (discussing principle of restoring consideration in suit for rescission).

Defendants contend that to repudiate the note, Cunningham must return the consideration -- if any -- he received in exchange for his future promise to pay. They indicate that Cunningham refuses to return the $1.025 million he claims he received in return for giving up a portion of his ownership interest in Mountain Country. (Cunningham dep. at 32, 34). The court need not reach this issue at this stage of the proceedings.

from Rick Wheat of Mountain Country to Cunningham dated February 20, 2007 ("You need to make sure you understand a couple of things, such as: a) this loan WILL BE REPAID")). Defendants argue that "[a]t best, on the question of whether Cunningham was fraudulently induced to enter [into] the note and security agreement, the court is faced with a he said/she said scenario . . . . far from showing by clear and convincing evidence that the note and security agreement were fraudulently induced. . . ." (Def.'s Mem. at 11).

Defendants' concession highlights the competing evidentiary presentations at play in this case. While the clear and convincing burden of proof presents plaintiff with a high standard to meet, the court concludes that the testimony from Messrs. Cunningham and Gwynn, if believed, is sufficient to warrant a reasonable fact finder to find the note was induced by fraudulent conduct. In short, the question of whether the claimed fraud took place is appropriately left for the finder of fact.[5]

---

[5] Defendants advance the additional argument that plaintiff's fraud claim should fail inasmuch as Cunningham can point to no damages sustained as a result of the alleged fraud. If plaintiff is held to his obligations under the note, he will owe the note holder the principal amount and interest according to its terms. In plaintiff's view, the execution of the note,

(Contin.).

Several issues concerning the formation of the promissory note, though not addressed by the parties, merit extended discussion. On May 4, 2012, the court entered the integrated pretrial order. The order supplants the parties' pleadings. See Rockwell Intern. Corp. v. United States, 549 U.S. 457, 474 (2007) ("Here, we have not only an amended complaint, but a final pretrial order that superseded all prior pleadings and 'controll[ed] the subsequent course of the action,' Fed. Rule Civ. Proc. 16(e)."). Section (3)(b), styled "Defendants -- Elements of Claims, Defenses, and Counterclaims" addresses "Elements of Counterclaims" at subsection (3)(b)(iii).

Further into the order at subsection (3)(b)(iii)(5)(a) is found the following elements for "Cunningham's Breach of Contract," which presumably relates to nonpayment of the note:

> Counterclaimant must show by a preponderance "(1) a valid contract; (2) a material breach; and (3) damages." Friedman v. New York Life Ins. Co., 985 So. 2d 56, 58 (Fla. 4th Dist. Ct. App. 2008).

(Integ. Pretr. Ord. at 12). Respecting the first element above, one commentator states as follows:

> The test for enforceability of an agreement is: (1)

---

eventually to be forgiven, was a mere legal formality employed to accomplish a stock sale -- not a loan that was to be repaid. Thus, to enforce the note against plaintiff would mean that the repayment obligations flowing from it would constitute substantial damages.

> whether both or all parties, with the capacity to contract, manifest objectively an intent to be bound by the agreement; (2) whether the essential terms of the agreement are sufficiently definite to be enforced; (3) whether there is consideration; and (4) whether the subject matter of the agreement and its performance are lawful.

1 Richard A. Lord, Williston on Contracts § 3:2 (4th ed. elec. 2012) (footnote omitted). Consideration and mutuality of assent are thus two indispensable prerequisites of a valid contract.

In framing these two issues for trial, the parties should consider at least two questions that have not been addressed previously. First, is whether the note is supported by adequate consideration, as required by Florida Statutes Annotated section 673.3031(2). Section 673.3031(2), a statutory provision comparable to Uniform Commercial Code section 3-303(b), states, "The term 'consideration' means any consideration sufficient to support a simple contract. The drawer or maker of an instrument has a defense if the instrument is issued without consideration." If the note is shown to have lacked consideration, the law is the same in West Virginia, Florida, and elsewhere. The absence of consideration results in a contract that is void ab initio. See, e.g., syl. pt. 1, Sturm v. Parish, 1 W. Va. 125 (1865) ("That a parol contract or promise without consideration is void, is too well established to require any comment."); Global Travel Marketing, Inc. v.

Shea, 908 So.2d 392, 398 (Fla. 2005) ("The difference arises because the rights of access to courts and trial by jury may be contractually relinquished, subject to defenses to contract enforcement including voidness for violation of the law or public policy, unconscionability, or lack of consideration."); Pick Kwik Food Stores, Inc. v. Tenser, 407 So.2d 216, 218 (Fla. App. 1981) ("[W]e conclude that the executory features of the contract were void from the beginning for lack of consideration or, as the rule is sometimes expressed, for lack of mutuality."); 17 C.J.S. Contracts § 164 (Elec. ed. 2012) ("An agreement under which a party parts with no value is void for failure of consideration.").

Second, is the potential applicability of the sham or pretensive contract doctrine. See, e.g., Lewis v. Dils Motor Co., 135 S.E.2d 597, 599 (W. Va. 1964) ("The trial court determined and held that the conditional sales contract and note represented a 'sham sale', and that the actual agreement between Hull and Dils Motor Company was that ownership of the Ford automobile was to remain with Dils Motor Company until it was sold to a purchaser in due course in the operation of the automobile sales business."); Lewis v. Lowry, 322 F.2d 453, 456 (4th Cir. 1963) (citation omitted) ("The principle of 'pretensive' contracts is well established, as noted by Judge

Haynsworth in the first opinion in this case. His ample precedents prescribe this measure of evidence as needed to present the defense: 'that the signed paper was never intended to be the record of the terms of the agreement.'") (quoting Burke v. Dulaney, 153 U.S. 228, 236 (1894)); see also Saks v. Charity Mission Baptist Church, 110 Cal. Rptr. 2d 45, 59 (Cal. App. 2001) ("A note may also be subject to the defense that it was intended to be 'void, i.e., a sham not intended between [the parties] as a jural act.'"); Restatement (Second) of Contracts, cmt. c § 18 (1981) (stating "Where all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously, there is no such manifestation of assent to the exchange as is required by this Section.").

The court need not further address the matter presently. The parties may, however, submit supplemental instructions on these points.

2. That Cunningham is not in Default as to the Note

Plaintiff also requests a declaration that plaintiff is not in default with respect to the note. The answer, however, depends on the resolution of the disputed factual question of fraudulent inducement. That is, if the factfinder

determines that the note and security agreement were fraudulently induced and are thus voidable, plaintiff may have no obligation with respect to the conditions pertaining to default. To the extent that a judicial declaration on this request depends on an underlying dispute of material fact, summary judgment is improper.

3. That the Assignment of the Note from Mountain Country to Legacy was a Fraudulent Transfer

In the first amended complaint, plaintiff also seeks a declaration that the assignment of the note from Mountain Country to Legacy was a fraudulent transfer. However, plaintiff abandons this request in his response memorandum, in which he states that he "never maintained that the transfer to Legacy was a 'fraudulent transfer.'" (Pl.'s Response at 1-2) (emphasis in original). "[R]ather, Plaintiff has maintained simply that Legacy was not a bona fide purchaser without notice. . . ." (Id.) (emphasis in original). Defendants' motion for summary judgment on this request for declaratory relief is granted.[6]

[6] In their memorandum of law in support of summary judgment, defendants state that "Legacy is entitled to a declaration that the transfer of the note and security agreement from [Mountain Country] to Legacy was not fraudulent" and that "the transfer of the note from MCP to Legacy was . . . legally binding." (Def.'s Mem at 12-14). Defendants later ask the court, in a footnote,

(Contin.).

**4. That Legacy was not a Holder in Due Course of the Note**

Cunningham also requests a declaration that Legacy was "not a bona fide purchaser for value without notice," that is, a "holder in due course" of the note. (First Am. Compl. at 8 (WHEREFORE clause)). A holder in due course means the holder of an instrument if:

> (a) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
>
> (b) The holder took the instrument:
>
> > 1. For value;
> >
> > 2. In good faith;
> >
> > 3. Without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series;
> >
> > 4. Without notice that the instrument contains an unauthorized signature or has been altered;

---

that "[t]o the extent necessary, Legacy requests that the Court consider this filing a motion to alter or amend its counterclaims under Federal Rule of Civil Procedure 15 . . ." (Id. at 15 n. 6). Absent the filing of a formal motion to amend, the court declines to address defendants' bare request to amend made in a footnote contained in its memorandum of law. Moreover, the deadline set in the court's scheduling order for amendment of pleadings has long since passed, and defendants have not shown good cause in support of its request to amend. See Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008) ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings.").

> 5. Without notice of any claim to the instrument described in [§] 673.3061; and
>
> 6. Without notice that any party has a defense or claim in recoupment described in [§] 673.3051(1).

Fla. Stat. § 673.3021(1).

Plaintiff argues that Legacy is not a holder in due course inasmuch as it was "at all times completely controlled by Mr. LeGrand in the same way that [Mountain Country] was completely controlled by Mr. LeGrand. . . ." (Pl.'s Response at 2-3 (citing LeGrand dep. at 6-7; Gwynn dep. at 30)). Plaintiff maintains that, because LeGrand knew as manager of each Mountain Country and Legacy of the fraudulent nature of the note, the transfer of the note from Mountain Country to Legacy "was not protected from attack" by the holder in due course rule. (Id. at 3 (citing LeGrand dep. 15-19)).

Section 673.1031(1)(d) defines "good faith" as meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing." In arriving at this language by legislative amendment in 1992, "the [Florida] legislature added an objective component -- the 'pure heart of the holder must now be accompanied by reasoning that assures conduct comporting with reasonable commercial standards of fair dealing.' No longer may a holder of an instrument act with 'a pure heart and an empty

head and still obtain holder in due course status.'" Any Kind Checks Cashed, Inc. v. Talcott, 830 So. 2d 160, 165 (Fla. App. 2002) (citations omitted).[7] To apply the law requiring "good faith" under section 673.3021(1), the Talcott court adopted the following analysis:

> The factfinder must . . . determine, first, whether the conduct of the holder comported with industry or "commercial" standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing. Each of those determinations must be made in the context of the specific transaction at hand. If the factfinder's conclusion on each point is "yes," the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a holder may be accorded holder in due course status where it acts pursuant to those reasonable commercial standards of fair dealing-even if it is negligent-but may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.

Id. at 165-66 (quoting Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada, 727 A.2d 335, 343 (Me. 1999)); see

[7] The Talcott court looked to the legislative annotations in pursuit of interpreting the "good faith" requirement:

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction.

Id. (quoting Fla. Stat. Ann. § 673.1031, cmt. 4).

also Daiwa Prods., Inc. v. Nationsbank, N.A., 885 So. 2d 884, 888-89 (Fla. App. 2004) (following analysis adopted in Talcott). In applying the good faith requirement, "'fairness' should be measured by taking a global view of the underlying transaction and all of its participants. A holder 'must act in a way that is fair according to commercial standards that are themselves reasonable.'" Talcott, 830 So. 2d at 165 (quoting Maine Family, 727 A.2d at 343).

Although neither party raises it, plaintiff's reliance on facts indicating that the transferor and transferee entities were solely managed and controlled by one individual -- defendant LeGrand -- implicates the "close connection" doctrine, which Florida has adopted. See Mut. Finance Co. v. Martin, 63 So. 2d 649, 652-53 (Fla. 1953).

In general terms, the close connection doctrine holds that a transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate that the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated. See Ramadan w. Equipo Lessors, Inc., 448 So. 2d 60, 61-62 (Fla. App. 1984); see also Equipo Lessors, Inc. v. Ramadan, 493 So. 2d 516, 518

(Fla. App. 1986) ("The close connection doctrine acts as an evidentiary rule by which the good faith of an assignee is tested.").[8] Florida courts have recognized, however, that "[i]n the commercial setting, more than just a close connection must be shown before an [transferee] will be denied the status of a holder in due course. . . ." Id.. This additional evidence may include, for instance, "the assignee's knowledge of the seller's fraudulent acts or its significant participation in the original transaction." Id. (citing Leasing Serv. Corp. v. River Cty. Constr., Inc., 742 F.2d 871 (11th Cir. 1984)).

[8] An early decision respecting the doctrine and cited favorably by Florida courts explains the basis of the rule as follows:

> The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving, credit-extending commercial world.

Unico v. Owen, 232 A.2d 405, 410 (N.J. 1967) (emphasis added).

Despite defendants' arguments that Legacy meets most of the requirements of holder in due course status, application of the close connection doctrine raises the question of whether defendant Legacy took the note in good faith. This is borne out by the undisputed fact that defendant LeGrand, as the manager and controller of both Mountain Country and Legacy, executed the assignment of Cunningham's note on behalf of both the transferor and transferee entities. He is also the same individual whom plaintiff asserts induced the original transaction by maintaining that the note and security agreement were mere formalities to be forgiven at a later date. The question of Legacy's status as a holder in due course thus depends on the resolution of this crucial issue of fact. That is, if the factfinder determines that LeGrand fraudulently induced the note, and then later signed the assignment of the note for both the transferee and transferor, a lack of good faith, among other things, would be shown. Far from constituting good faith, such circumstances -- if proven -- would demonstrate the antithesis of reasonable commercial standards of fair dealing. In short, the disputed acts of fraud preclude summary judgment on plaintiff's request for a declaration that Legacy was not a holder in due course of plaintiff's note.

### 5. That Legacy Knew the Note was Void When it Received the Note From Mountain Country

Although the court has already determined that the disputed note and accompanying security agreement are at most voidable and not void, this request for a declaration also depends on the resolution of the underlying factual question of fraud. To the extent that LeGrand, as manager and signatory for both Mountain Country and Legacy, "knew" the note suffered an infirmity such as fraud, a disputed issue of material fact remains. Summary judgment on this request is also inappropriate.

## D. Defendants' Counterclaim for Breach of Contract

Defendants seek summary judgment on their breach of contract counterclaim against plaintiff, the obligor under the note. As discussed above, fraud in the inducement, if shown, is a defense to the enforcement of a contract. Here, whether the fraudulent conduct occurred awaits resolution by the finder of fact. Defendants are thus not entitled to summary judgment on their counterclaim.

## III. Conclusion

In sum, defendants are entitled to summary judgment only in two respects: 1) that the note and security agreement

**are at most voidable and not void; and, 2) that the assignment of the note from Mountain Country to Legacy was not a fraudulent transfer. Defendants' motion is denied in all other respects. Plaintiff's motion is denied.**

**In view of the foregoing discussion, it is ORDERED as follows:**

1) **That plaintiff's motion for summary judgment be, and it hereby is, denied;**

2) **That defendants' motion for summary judgment be, and it hereby is, granted only to the extent that the assignment of the note from Mountain Country to Legacy was not a fraudulent transfer, and denied in all other respects.**

**The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.**

**Enter: June 5, 2012**

**John T. Copenhaver, Jr.**
**United States District Judge**